1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Anthony Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
AQUA TERRA AERIS LAW GROUP LLP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (415) 326-3173
Email: amb@atalawgroup.com

*Attorneys for Plaintiff*
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA SPORTFISHING PROTECTION
ALLIANCE,

                Plaintiff,

         v.

C&S WASTE SOLUTIONS OF CALIFORNIA,
INC., SOLID WASTES SYSTEMS, INC.,
PACIFIC RECYCLING SOLUTIONS, INC., CS
SOLUTIONS, INC.

            Defendants.

Civil Case No.:

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

**(Federal Water Pollution Control Act,
33 U.S.C. §§ 1251 *et seq.*)**

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.       JURISDICTION AND VENUE

1.       This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.       On October 6, 2016, CSPA issued a 60-day notice letter ("Notice Letter") to C&S Waste Solutions of California, Inc, Solid Wastes Systems, Inc., and, upon information and belief, the parent companies of these entities, Pacific Recycling Solutions, Inc., parent company to C&S Waste Solutions of California, and CS Solutions, Inc., parent company to Solid Wastes Systems, Inc. ("Defendants"). Upon information and belief, each of these entities share the same ownership group; each of them has the same Agent for Service of Process, an individual identified in publicly available sources as the owner of the facilities, and the same Vice President. The Notice Letter informed Defendants of their violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively, hereinafter referred to as the "Storm Water Permit") and the Clean Water Act at two waste facilities: 1) C&S Waste Solutions Inc., located at 3515 Taylor Drive, Ukiah, California 95482 ("C&S Facility"); and 2) Solid Wastes Systems, Inc., located at 3151 Taylor Drive, Ukiah, California 95482 ("Solid Wastes Facility"). The Notice Letter informed Defendants of CSPA's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

3.       The Notice Letter was sent to the Owner and current registered Agent for Service of Process, and Vice President for C&S Waste Solutions Inc., Solid Wastes Systems, Inc., Pacific Recycling Solutions, Inc., and CS Solutions, Inc., as the owners and operators of the C&S Facility and the Solid Wastes Facility (collectively the "Facilities"), as required by 40 C.F.R. § 135.2(a)(1). The

Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, North Coast Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as Exhibit A and is incorporated herein by reference.

4.      More than sixty (60) days have passed since the Notice Letter was served on the Defendants and the State and Federal agencies. CSPA is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6.      Plaintiff also seeks relief from Defendants' violations of the procedural and substantive requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## II.      <u>INTRODUCTION</u>

7.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facilities referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Stormwater and non-stormwater contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted stormwater harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding

1  communities. The public's use of the surface waters exposes many people to toxic metals and other

2  contaminants in stormwater and non-stormwater discharges. Non-contact recreational and aesthetic

3  opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving

4  Waters.

5  8.    High concentrations of total suspended solids ("TSS") degrade optical water quality by

6  reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to

7  alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey).

8  Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to

9  aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons

10 ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of

11 toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended

12 solids, have been shown to negatively impact species richness, diversity, and total biomass of filter

13 feeding aquatic organisms on bottom surfaces.

14 9.    Stormwater discharged with high pH can damage the gills and skin of aquatic organisms

15 and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a

16 substance varies as a function of the pH of a solution. A one whole unit change in standard units ("s.u.")

17 represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low,

18 the aquatic organisms living within it will become stressed or die.

19 10.   This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil

20 penalties, and the award of costs, including attorney and expert witness fees, for Defendants' substantive

21 and procedural violations of the Storm Water Permit and the Clean Water Act resulting from

22 Defendants' operations at the Facilities.[1]

23 11.   CSPA specifically alleges violations regarding Defendants discharge of pollutants from

24 the Facilities into waters of the United States; violations of the filing, monitoring and reporting, and best

25 management practice requirements; and violations of other procedural and substantive requirements of

26 the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

27

28

---

[1] The Facilities are fully described in Section V below.

Complaint for Declaratory and Injunctive Relief      4
and Civil Penalties

III.      **PARTIES**

A.      **California Sportfishing Protection Alliance**

12.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a California non-profit public benefit organization with its principal place of business in Stockton, California. CSPA's organizational purpose is the protection, preservation, and enhancement of fisheries and associated aquatic and riparian ecosystems of California's waterways, including the Russian River. This mission is implemented through active participation in water rights and water quality processes, education and organization of the fishing community, restoration efforts, and vigorous enforcement of environmental laws enacted to protect fisheries, habitat and water quality. Members of CSPA use and enjoy California's numerous rivers for recreation and other activities, including the Russian River, where they view, enjoy, and routinely use the Russian River for rafting, fishing, birdwatching, wildlife viewing, and to engage in scientific study, among other things. CSPA's members derive significant and ongoing use and enjoyment from the aesthetic, recreational, and conservation benefits of the Russian River watershed.

13.      CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including the Russian River. CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California. To further these goals, CSPA actively seeks federal and state agency implementation of the Clean Water Act and other laws and, where necessary, directly initiates citizen enforcement. As referenced in paragraph 12, members of CSPA use and enjoy the waters of the Russian River, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged. Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act and/or the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

14.      Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendants' discharge of

polluted stormwater and non-stormwater from the Facilities, negatively impacts and impairs CSPA's members' use and enjoyment of these waters.

15.  Continuing commission of the acts and omissions alleged herein will irreparably harm CSPA's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.  The Owners and Operators of the Facilities**

16.  CSPA is informed and believes, and thereon alleges, that C&S Waste Solutions of California, Inc. is a corporation formed under the laws of the State of California. CSPA is informed and believes, and thereon alleges, that the registered agent for service of process for C&S Waste Solutions of California, Inc. is David Carroll, at 3515 Taylor Drive, Ukiah CA, 95482.

17.  CSPA is informed and believes, and thereon alleges, that Solid Wastes Systems, Inc. is a corporation formed under the laws of the State of California. CSPA is informed and believes, and thereon alleges, that the registered agent for service of process for Solid Wastes Systems, Inc. is David Carroll, at 3515 Taylor Drive, Ukiah CA, 95482.

18.  CSPA is informed and believes, and thereon alleges, that Pacific Recycling Solutions, Inc., is a corporation formed under the laws of the State of California. CSPA is informed and believes, and thereon alleges, that the registered agent for service of process for Pacific Recycling Solutions, Inc. is David Carroll, at 3515 Taylor Drive, Ukiah CA, 95482.

19.  CSPA is informed and believes, and thereon alleges, that CS Solutions, Inc. is a corporation formed under the laws of the State of California. CSPA is informed and believes, and thereon alleges, that the registered agent for service of process for CS Solutions, Inc. is David Carroll, at 3515 Taylor Drive, Ukiah CA, 95482.

20.  CSPA is informed and believes, and thereon alleges, that David Carroll and Pacific Recycling Solutions, Inc. are owners and/or operators of the C&S Facility.

21.  CSPA is informed and believes, and thereon alleges, that David Carroll and CS Solutions, Inc. are owners and/or operators of the Solid Wastes Facility.

22.  Collectively, CSPA refers to David Carrol, C&S Waste Solutions of California, Inc., Solid Wastes Systems, Inc., Pacific Recycling Solutions, Inc., and CS Solutions, Inc. as "the Owners and/or Operators," defined herein as the Owners and/or Operators of the Facilities.

1    IV.      **STATUTORY BACKGROUND**

2            A.      **The Clean Water Act**

3            23.      Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of

4    any pollutant into waters of the United States unless the discharge complies with various enumerated

5    sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in

6    violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued

7    pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

8            24.      Section 402(p) of the CWA establishes a framework for regulating municipal and

9    industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved

10   NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges

11   through individual permits issued to dischargers and/or through the issuance of a single, statewide

12   general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342.

13           25.      Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source

14   dischargers, including those discharging polluted stormwater, must achieve technology-based effluent

15   limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and

16   nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for

17   conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

18           26.      The Clean Water Act requires point source discharges of pollutants to navigable waters

19   be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

20           27.      The "discharge of a pollutant" means, among other things, "any addition of any pollutant

21   to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

22           28.      The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage,

23   garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat,

24   wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste

25   discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

26           29.      The term "point source" means any "discernible, confined and discrete conveyance,

27   including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container,

28   rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which

1  pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

2      30.    "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

3      31.    "Waters of the United States" are defined as "navigable waters," and "all waters which

4  are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce,

5  including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

6      32.    The EPA promulgated regulations for the Section 402 NPDES permit program defining

7  "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to

8  include not only traditionally navigable waters but also other waters, including waters tributary to

9  navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams

10  that could affect interstate commerce.

11     33.    The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to

12  traditionally navigable waters where the non-navigable water at issue has a significant nexus to the

13  navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v.*

14  *City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

15     34.    A significant nexus is established if the "[receiving waters], either alone or in

16  combination with similarly situated lands in the region, significantly affect the chemical, physical, and

17  biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d

18  at 999-1000.

19     35.    A significant nexus is also established if waters that are tributary to navigable waters

20  have flood control properties, including functions such as the reduction of flow, pollutant trapping, and

21  nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

22     36.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen

23  enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or

24  limitation . . . or an order issued by the Administrator or a State with respect to such a standard or

25  limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

26     37.    The Defendants are "person[s]" within the meaning of Section 502(5) of the Clean Water

27  Act, 33 U.S.C. § 1362(5).

28     38.    An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C.

§ 1365(a).

39.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day, pursuant to Sections 309(d) and 505 of the CWA. *See* 33 U.S.C. § 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

40.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.     California's Storm Water Permit**

41.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial stormwater dischargers. *See id.*

42.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Water Resources Control Board ("State Board") and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

43.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

44.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§

122.44(D)(1).

45.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

46.     On July 1, 2015 the 2015 Permit became effective, and was issued as NPDES No. CAS000001 (the same NPDES permit number as the 1997 Permit). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

47.     In order to discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

48.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

C.     **The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

49.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

50.     Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in

stormwater discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

51.     Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

52.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

53.     The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: pH – 6.0 – 9.0 standard units "s.u."); TSS – 100 mg/L; lead ("Pb") – 0.069 mg/L; iron – 1.0 mg/L; nitrate plus nitrite as nitrogen ("N+N") – 0.68 mg/L; aluminum ("Al") – 0.75 mg/L; copper ("Cu") – 0.0123 mg/L; and zinc – 0.13 mg/L. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

54.     The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

55.     Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit stormwater discharges from adversely impacting human health or the environment.

56.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

57.     Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit stormwater discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

58.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

59.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

60.     The State Water Quality Control Board, North Coast Region (May 2011), has issued the Water Quality Control Plan for the North Coast Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." The Basin Plan also provides that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms." The Basin Plan also establishes that the dissolved oxygen levels of the stretch of the Russian River to which the Facilities discharges may not be depressed below 7.0 mg/L. Basin Plan, Table 3-1. The Basin Plan sets forth water quality objectives for dissolved metals, such as arsenic, zinc, copper, lead, and mercury. *Id.*, Table 3.2. The Basin Plan also states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id.*

61.     The Basin Plan also identifies present and potential beneficial uses for upper Russian River, including municipal and domestic supply, agricultural supply, industrial service supply, navigation, commercial and sport fishing, freshwater replenishment, groundwater recharge, preservation of rare and endangered species, wildlife habitat, estuarine habitat, aquaculture, migration, and contact and non-contact water recreation.

62.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act. According to the 2010 303(d) List of Impaired Water Bodies the Russian River is listed for the following CWA 303(d) impairments: Mercury, Sedimentation/Siltation, and Temperature.[2] Thus, the receiving waters for pollution from the Facilities are impaired, and the Defendants' illegal discharges of pollutants above the WQS contributes to the continued impairment of the Russian River's beneficial uses.

63.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

64.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[3]

65.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

66.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

---

[2] http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_report.shtml (last accessed on November 7, 2016.)

[3] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18.

Complaint for Declaratory and Injunctive Relief          13
and Civil Penalties

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.**     **The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

67.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

68.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

69.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to stormwater, and to reduce or prevent the

1  discharge of polluted stormwater from industrial facilities. 1997 Permit, Section A(2); 2015 Permit,

2  Section X.

3      70.    The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual

4  basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section

5  A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct

6  an annual comprehensive site compliance evaluation that includes a review of all visual observation

7  records, inspection reports, and sampling and analysis results, a visual inspection of all potential

8  pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review

9  and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and

10  maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to

11  implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

12      71.    Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation

13  report that includes an identification of personnel performing the evaluation, the date(s) of the

14  evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents

15  of non-compliance and the corrective actions taken, and a certification that the discharger is in

16  compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of

17  compliance cannot be provided, the discharger must explain in the evaluation report why the facility is

18  not in compliance with the Storm Water Permit. *Id*., Section A(9)(d). The evaluation report shall be

19  submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id*.

20      72.    The SWPPP and site maps must be assessed annually and revised as necessary to ensure

21  accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding

22  55), X(B)(1).

23      **E.    The Storm Water Permit's Monitoring and Reporting Requirements**

24      73.    The 1997 Permit required facility operators to develop and implement a monitoring and

25  reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2)

26  and E(3). The M&RP must have ensured that stormwater discharges are in compliance with the

27  Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997

28  Permit. *Id.* at Section B(2). The M&RP must have ensured that practices at the facility to prevent or

---

Complaint for Declaratory and Injunctive Relief      15
and Civil Penalties

1 reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to

2 meet changing conditions at the facility, including revision of the SWPPP. *Id.*

3    74.    The objectives of the M&RP are to ensure that BMPs have been adequately developed

4 and implemented, revised if necessary, and to ensure that stormwater and non-stormwater discharges are

5 in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and

6 Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

7    75.    The M&RP aids in the implementation and revision of the SWPPP and measures the

8 effectiveness of BMPs to prevent or reduce pollutants in stormwater discharges. *Id.*, 1997 Permit

9 Section B(2)(c) and B(2)(d).

10    76.    The 2015 Permit requires facility operators to monitor and sample stormwater discharges

11 to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings

12 55-56) and XI.

13    77.    Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that

14 the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

15    78.    Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require

16 dischargers to conduct monthly visual observations of stormwater discharges.

17    79.    Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires

18 dischargers to document the presence of any floating and suspended materials, O&G, discolorations,

19 turbidity, or odor in the discharge, and the source of any pollutants in stormwater discharges from the

20 facility. Dischargers are required to maintain records of observations, observation dates, discharge

21 locations observed, and responses taken to reduce or prevent pollutants from contacting stormwater

22 discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The Storm Water Permit

23 also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing

24 and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

25    80.    The Storm Water Permit requires dischargers to visually observe and collect samples of

26 stormwater discharges from all locations where stormwater is discharged. 1997 Permit, Sections B(5)

27 and B(7); 2015 Permit Section XI(B)(4).

28

81.     Section B(5)(a) of the 1997 Permit requires dischargers to collect stormwater samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All stormwater discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

82.     Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without stormwater discharge.

83.     Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and TOC. A discharger may substitute analysis for O&G instead of TOC.

84.     Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharged from the facility.

85.     Section B(5)(c)(iii) and Table D of the 1997 Permit, require facilities classified as Standard Industrial Classification ("SIC") code 5093, such as the Facilities, to also analyze stormwater samples for chemical oxygen demand ("COD"), iron ("Fe"), zinc ("Zn"), aluminum ("Al"), copper ("Cu") and lead ("Pb"). 1997 General Permit, Table D; 2015 General Permit Tables 1-2.

86.     Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

87.     Section B(15)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

88.     Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

89.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze stormwater samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

90.     Section XI(B)(6) of the 2015 Permit requires dischargers to analyze stormwater samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

91.     Table 1 of the 2015 Permit requires Facilities under SIC code 5093, such as the Facilities herein, to analyze stormwater samples for iron, lead, aluminum, zinc and COD. 2015 General Permit Tables 1-2. The Facilities' December 2015 SWPPPs also require testing for Copper ("Cu"), with reference in the SWPPPs to SIC Code 5093 (C&S Facility), and to a "Source Assessment" requirement (Solid Wastes Facility).

92.     Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

V.      **STATEMENT OF FACTS**

     A.      **The C&S Facility Site Description**

93.     The C&S Facility is located at 3515 Taylor Drive within an unincorporated area of Mendocino County adjacent to Ukiah, CA 95482. The C&S Facility is an approximately 15-acre Scrap and Waste Materials facility consisting of a five (5) industrial buildings totaling an estimated 163,000 square feet, one of which is a large metals recovery facility. The C&S Facility contains loading docks

for receiving, sorting, baling and transferring waste, ferrous and non-ferrous scrap metal and recyclable materials, bone yards, grinding operation areas, truck and equipment repair and cleaning areas, commercial truck scales, truck fleet and other parking areas, a 12,000-gallon fuel tank and fueling area, and an office. The industrial activities of the C&S Facility fall under Standard Industrial Classification ("SIC") Code 5093 – Scrap and Waste Metals.

94.     Industrial operations and activities taking place at the C&S Facility include but are not limited to: receiving, processing and transfer of recyclable materials; receiving, sorting, baling and transferring of single-stream recyclables; recovering substantive materials in the Metals and Materials Recovery Facility; receiving, grinding, transferring and composting of municipal green waste; receiving, sorting, baling and transferring of ferrous and non-ferrous scrap metal; truck and equipment repair, maintenance and cleaning; truck and other vehicle traffic and parking.

95.     The C&S Facility collects and discharges polluted stormwater associated with industrial activities pursuant to the General Permit through at least three discharge points, which flow to an off-site drainage ditch that discharges to the Russian River, approximately 1100 feet downstream from the drainage ditch. The Russian River is a water of the United States within the meaning of the CWA. Upon information and belief, there are other locations at the C&S Facility discharging stormwater associated with industrial activities, namely from borders and other runoff areas of the C&S Facility. These discharges also enter the Russian River. At least three of the drainage areas at the C&S Facility are associated with industrial activities, a scrap metal processing area, a material handling and storage area, and a maintenance, parking and storage area. Pursuant to the C&S Facility SWPPP, stormwater flows in various directions from these industrial areas into drainage inlets which discharge into an offsite drainage ditch that flows into the Russian River. The three stormwater sampling locations identified in the C&S Facility SWPPP are situated generally adjacent to these site drainage areas.

96.     Information available to CSPA suggests that the C&S Facility discharges quantities of unauthorized non-stormwater. Activities at the C&S Facility resulting in unauthorized non-stormwater discharges include but are not limited to, truck and cart washing, fluids from dumping or unloading waste, recycling and other material, fueling, replenishing fluid levels and using equipment with hydraulic oil, and cleaning/flushing of storm drains and inlets.

97.     CSPA is informed and believes, and thereon alleges, that the C&S Facility's areas described herein, lack adequate cover or secondary containment, and certain industrial activities occur outside without adequate cover or secondary containment, resulting in discharges of polluted stormwater. Vehicle and other traffic at the C&S Facility track dust and particulate matter, increasing the discharge of polluted water, sediments and debris into waters of the United States.

**B.     The Solid Wastes Facility Site Description**

98.     The Solid Wastes Facility is located at 3151 Taylor Drive within an unincorporated area of Mendocino County, adjacent to Ukiah, CA 95482. The C&S Facility is an approximately 4-acre scrap and waste materials transfer station and recycling center facility, designed to accommodate the unloading, handling and transfer of municipal solid waste, wood chips, compost, construction & demolition materials, waste and a wide variety of recyclable materials, including electronics. The Solid Wastes Facility consists of industrial buildings, transfer stations, a truck scale, drop-off areas, waste sorting areas, storage tanks, hazardous waste storage areas, a ferrous and non-ferrous scrap metal drop off area, a fueling area with a 5,000-gallon fuel tank, bone yards, truck and other parking areas, and an office. The industrial activities of the Facility fall under Standard Industrial Classification ("SIC") Code 5093 – Scrap and Waste Metals, and 4212 – Local Trucking without Storage.

99.     Industrial operations and activities taking place at the Solid Wastes Facility include but are not limited to: receiving, handling and transferring of municipal solid waste, construction & demolition debris and green waste on transfer station tipping floor; public drop-off of recyclables, electronic waste, scrap metal, appliances, used motor oil & oil filters, construction and demolition debris, used antifreeze, kitchen grease, tires and batteries; storage of recycled landscape products (wood chips, compost) for sale to public; temporary storage of household hazardous waste collected through a load checking program; re-use areas; equipment and vehicle repair and washing; and California Redemption Value buyback (individuals trading recyclables for money). Large-haul waste is received on the tipping floor of the transfer station building and the material is sorted on the floor by facility personnel and top-loaded into transfer trailers. Tires are accepted and set aside throughout the day for loading into a designated tire trailer, which is transferred to a tire recycling facility. Public drop-off boxes for mixed recycling are located near the truck scale. Once filled, the boxes are transferred

throughout the day to a nearby recycling facility. Aluminum cans are crushed onsite and transferred to a recycling facility. Glass bottles are sorted and stored outdoors in concrete bunkers until transferred for recycling. Appliances, scrap metal, and electronic waste are accepted with re-usable items salvaged from the waste stream are made available to the public. Accepted landscape waste is stored outdoors, sold to the public and then loaded into trucks and trailers using a front loader. Hazardous waste is accepted on a continuous basis into a designated area.

100.    CSPA is informed and believes, that the Solid Wastes Facility collects and discharges polluted stormwater associated with industrial activities pursuant to the General Permit through at least three outfall points into offsite drainage swales that flow into the Russian River. The Russian River is a water of the United States within the meaning of the CWA. Upon information and belief, there are other locations at the Solid Wastes Facility discharging stormwater associated with industrial activities, namely from borders and other runoff areas of the Solid Wasted Facility.

101.    CSPA is informed and believes that there are at least four drainage areas at the Solid Wastes Facility associated with industrial activities: the transfer station adjacent to the construction and demolition debris storage area, the office and storage buildings area, the northern portion of the industrial site, and an area that discharges from the employee parking area into a landscaped area. Storm water flows from three of these drainage areas in various directions into drainage inlets located in each of the drainage areas; the drainage inlets then discharge from at least three points into the offsite swales that flow into the Russian River. Drainage from a fourth discharge points migrates towards Taylor Drive to the west and eventually enters the Russian River. Pursuant to the Solid Wastes Facility SWPPP there are three stormwater sampling locations situated generally adjacent to site drainage areas from three out of the four drainage areas.

102.    Information available to CSPA suggests that the Solid Wastes Facility discharges quantities of unauthorized non-stormwater, including but not limited to, fluids from unloaded wastes and materials discharging to nearby drainage areas or inlets, rinse waters and potable line flush waters, vehicle and equipment cleaning, and cleaning of areas impacted by industrial activated at the Solid Wastes Facility.

103.    CSPA is informed and believes, and thereon alleges, that the Solid Wastes Facility's

1   areas described herein, lack adequate cover or secondary containment, and certain industrial activities

2   occur outside without adequate cover or secondary containment, resulting in discharges of polluted

3   stormwater. Vehicle and other traffic at the Solid Wastes Facility track dust and particulate matter,

4   increasing the discharge of polluted water, sediments and debris into waters of the United States.

5   **C.    The Russian River**

6   104.    The Russian River watershed is approximately 100 miles long and from 12 to 32 miles

7   wide, draining an area of some 1,485 square miles. The headwaters of the Russian River are about 16

8   miles north of Ukiah. The river flows southward for 90 miles through Redwood, Ukiah, Hopland, and

9   Alexander Valleys, and through the northwestern part of the Santa Rosa Plain, before entering the

10  Pacific Ocean at Jenner.

11  105.    The Russian River is home to at least two species of salmonids: coho salmon and

12  chinook. These two species have experienced severe population declines and are listed as threatened

13  under the Endangered Species Act, with coho also listed as "endangered" under the California

14  Endangered Species Act. The Russian River is also home to other species whose populations are

15  threatened, endangered or declining to a level of concern, including but not limited to, freshwater shrimp

16  (Federally Endangered/State Endangered); Western pond turtles (California Species of Concern);

17  western tailed frogs (California Species of Concern); California tiger salamanders (Federally Proposed

18  for Listing/State Species of Concern); and foothill yellow-legged frogs (California Species of Concern).

19  Shrubs, flowering plants, and vines provide sites for nesting shelter and shade for many animals, algae

20  and moss proliferate on rocks and in the water with insects thriving and providing abundant food sources

21  for invertebrates, fish, and birds.

22  **D.    The Facilities' Storm Water Permit Coverage**

23  106.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators of

24  the Facilities submitted NOIs for coverage under the 1997 Permit.

25  107.    CSPA is not currently in possession of NOIs or SWPPP's submitted prior to 2015, to

26  cover the Facilities, but CSPA is informed and believes, and thereon alleges, that the Owners and/or

27  Operators of the Facilities, previously submitted NOIs for coverage under the 1997 Permit. Further

28  information about coverage under the 1997 permit will be sought in discovery.

108.   CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators of Facilities recently submitted NOIs for their industrial operations on or about March 11, 2015, for coverage for the Facilities under the 2015 Permit.

109.   The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current C&S Facility Waste Discharge Identification ("WDID") number as 1 23I023565. SMARTS lists the C&S Facility's coverage under the Storm Water Permit as "Active."

110.   SMARTS lists the current Solid Wastes Facility Waste Discharge Identification ("WDID") number as 1 23I015718. SMARTS lists the Solid Wastes Facility's coverage under the Storm Water Permit as "Active."

111.   The NOIs for both Facilities identify the receiving water for discharges and runoff from the Facilities to be the Russian River.

112.   Via search of the SMARTS database, CSPA obtained a SWPPP for the C&S Facility dated last revised in October 2015 ("C&S Facility SWPPP").

113.   Via search of the SMARTS database, CSPA obtained a SWPPP for the Solid Wastes Facility dated last revised on October 15, 2015 ("Solid Wastes Facility SWPPP").

114.   CSPA is informed and believes, and thereon alleges, that the Facilities' SWPPPs fail to describe and/or adequately describe all of the Facilities industrial activities or processes.

115.   CSPA is informed and believes, and thereon alleges, that because the Facilities' SWPPPs fail to describe and/or adequately describe all of the Facilities industrial activities, the Facilities' SWPPPs also fail to describe and/or adequately describe all of the significant materials and processes that are related to the Facilities' industrial activities.

116.   CSPA is informed and believes, and thereon alleges, that pollutants associated with the Facilities include, but are not limited to: pH-affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); BOD; TSS; benzene; pesticides; gasoline and diesel fuels; TKN, trash; fugitive and other dust and dirt; and O&G.

117.   CSPA is informed and believes, and thereon alleges, that without properly identifying all

1  industrial activities or all significant materials at the Facilities in the SWPPPs, the Owners and/or

2  Operators have not developed and/or implemented all appropriate BMPs.

3      118.    CSPA is informed and believes, and thereon alleges, that the Facilities' SWPPPs include

4  no assessments and/or no adequate assessments of potential pollutant sources, the associated pollutants,

5  and the corresponding BMPs at the Facilities.

6      119.    CSPA is informed and believes, and thereon alleges, that the Facilities SWPPPs include

7  no description and/or no adequate description of the Facilities BMPs, analyses of the effectiveness of the

8  BMPs, or summaries of the BMPs by pollutant source.

9      120.    CSPA is informed and believes, and thereupon alleges, that Owners and/or Operators

10  have failed and continue to fail to develop the Facilities' SWPPPs and site-specific BMPs consistent

11  with Section A of the 1997 Permit, and Section X of the 2015 Permit.

12      121.    CSPA is informed and believes, and thereon alleges, that Defendants' SWPPPs fail and

13  continue to fail to include an adequate: (1) list of significant materials handled and stored at the site; (2)

14  description of potential pollutant sources including industrial processes, material handling and

15  stockpiling areas, dust and particulate generating activities; (3) description of significant spills and leaks;

16  or (4) list of all non-stormwater discharges and their sources; Section A of the 1997 Permit and Section

17  X of the 2015 Permit.

18      122.    CSPA is informed and believes, and thereon alleges, that stormwater sampling at the

19  Facilities demonstrate that Facilities' stormwater discharges contain concentrations of pollutants above

20  the Benchmark Levels, including but not limited to aluminum, copper, iron, zinc, lead, and TSS.

21      123.    CSPA is informed and believes, and thereon alleges, that the repeated and significant

22  exceedances of Benchmark Levels demonstrate that the Facilities Owners and/or Operators have failed

23  and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to

24  stormwater and to prevent discharges of polluted stormwater and non-stormwater from the Facilities.

25      124.    CSPA is informed and believes, and thereon alleges, that the Facilities Owners and/or

26  Operators have failed and continue to fail to adequately revise the SWPPPs, despite repeated and

27  significant concentrations of pollutants in the Facilities' stormwater discharges, make changes to the

28  Facilities' training programs, or make any other changes based upon events that would signal a need for

Complaint for Declaratory and Injunctive Relief     24
and Civil Penalties

1   required revisions or alteration of practices.

2        125.   CSPA is informed and believes, and thereon alleges, that some of the Facilities' industrial

3   operations are conducted outdoors without secondary containment or other measures to prevent polluted

4   stormwater from discharging from the Facilities.

5        126.   CSPA is informed and believes, and thereon alleges, that pollutants, including but not

6   limited to those referenced herein, have been and continue to be tracked throughout the Facilities'

7   operation areas and offsite.

8        127.   CSPA is informed and believes, and thereon alleges, that these pollutants are deposited

9   into water bodies, and onto streets and/or into storm drains adjacent to the Facilities via fugitive dust and

10  other means, including but not limited to dust generated by wind, equipment and vehicles.

11       128.   CSPA is informed and believes, and thereon alleges, that trucks and vehicles leaving the

12  Facilities via staging areas and driveways are pollutant sources tracking sediment, dirt, oil and grease,

13  pesticides, metal particulates, and other pollutants off-site.

14       129.   CSPA is informed and believes, and thereon alleges, that the Facilities Owners' and/or

15  Operators' failure to properly address pollutant sources and pollutants results in the exposure of

16  pollutants associated with their industrial activities to precipitation, and that this results in discharges of

17  polluted stormwater from the Facilities and into local waterways in violation of the Storm Water Permit

18  and/or the Clean Water Act.

19       130.   CSPA is informed and believes, and thereon alleges, that BAT/BCT for the Facilities is

20  full enclosure of all uncovered bulk material stockpiles, and industrial operations that cause the spread

21  and release of pollutants, and cleanup of any waste materials, and unused, broken, or legacy equipment

22  at the Facilities.

23       131.   CSPA is informed and believes, and thereon alleges, that Defendants have failed to

24  achieve compliance with BAT/BCT requirements by failing to fully enclose bulk material stockpiles,

25  waste materials, industrial operations that cause the spread and release of pollutants, and unused, broken

26  or legacy equipment.

27       132.   CSPA is informed and believes, and thereon alleges, that the Facilities Owners and/or

28  Operators' failure to properly address these pollutants and their sources results in the exposure of

pollutants to precipitation, which carries these pollutants with stormwater flows from the Facilities into the Russian River.

133.    CSPA is informed and believes, and thereon alleges, that Defendant's failure to properly address these pollutants and their sources results in the discharge of fugitive dust, including but not limited to dust generated by industrial operations, wind, equipment, and vehicles, which carries these pollutants to off-site waterbodies, and to off-site properties, streets and storm drains adjacent to the Facilities. Pollutants deposited off-site eventually flow into the Russian River.

### E.    Stormwater Discharges at the Facilities

#### 1.  The C&S Facility

134.    The C&S Facility's Owners and/or Operators report that there are three (3) discharge points at the C&S Facility, described as drainage areas, which accept stormwater flowing in various directions from these three on-site industrial areas into drainage inlets which then discharge to an off-site drainage ditch that discharges to the Russian River, approximately 1100 feet downstream from the drainage ditch. Drainage area 1 accepts stormwater from the scrap metal processing areas on the site and drains to the west into a bioswale before discharging into a culvert at the north property line. Drainage area 2 accepts stormwater from the material handling and storage area and drains activities around the Metals Recycling Facility building and north side of a maintenance area and compost building. Stormwater flows into slot drains and discharges at the east property line to an off-site vegetated ditch. Drainage area 3 accepts stormwater from maintenance, parking and storage areas, and drains the parking lot, office building, maintenance shop, and activities around the south and east side of the maintenance areas and compost building eventually flowing to the east along the south property line in a swale into the southeast corner of the site where it outlets into an off-site drainage ditch.

135.    The three stormwater sampling locations identified in the C&S Facility SWPPP are situated generally adjacent to site drainage areas. Sample Point 1 is located at a northwest corner of a metal yard at a stormwater collection outlet, and carries stormwater generally draining from and around the scrap metal processing area; Sample Point 2 is located at southeast of a Metals Recycling Facility tip floor at an outfall on the eastern side of a fence; Sample Point 3 is located in the southeastern corner of the yard south of a maintenance area and compost building.

1

### 2. The Solid Wastes Facility

2      136.    The Solid Wastes Facility's Owners and/or Operators report that there are four (4)

3    stormwater drainage and discharge areas at the site, but only three (3) areas are affected by industrial

4    activities at the Solid Wastes Facility. Stormwater discharges to an off-site drainage ditch that

5    discharges to the Russian River, approximately 2,000 feet downstream.

6      137.    The three drainage areas generally coincide with the stormwater sampling points. Surface

7    drainage at the site flows in many directions, into offsite drainage swales that flow parallel to the east

8    and south property lines. At the southeast corner of the site two drainages converge and continue on to

9    intersect with another drainage which flows east to the Russian River. Onsite stormwater is collected

10   and conveyed into and from drain inlets that drain to three outfalls – one on the east side and two on the

11   south side of the site.

12     138.    Drainage area 1 consists of the south portion of the recycling and waste materials transfer

13   station apron and construction and debris bunkers. Stormwater flows to the southwest into an inlet and

14   discharges to an outfall at Sample Point 1. Drainage area 2 consists of the southeast corner of the site

15   and the area adjacent to the recycling and waste materials transfer station, behind the construction and

16   debris bunkers and other onsite storage locations, including a hazardous waste storage locker

17   Stormwater flows into inlets that all discharge to an outfall at Sample Point 2. Drainage area 3 covers

18   the northern half of the site and accept stormwater from in an around the recycling drop-off and storage

19   areas, including a storage area for waste oil and antifreeze. Stormwater flows into inlets that discharge to

20   an outfall on the eastern side of the site at Sample Point 3. Drainage area 4 has been wrongly excluded

21   from sampling and discharges into a landscaped area west of the employee parking area adjacent to

22   Taylor Drive where stormwater eventually migrates the Russian River. This drainage area includes a

23   scrap metal drop-off storage area, the e-waste trailer, an office and storage building and the employee

24   parking lot.

25     **F.    The Facilities' Stormwater Discharges to the Receiving Waters Contain Elevated
        Levels of Pollutants**

26

27     139.    CSPA is informed and believes, and thereon alleges, that pollutants from the Facilities

28   discharge from multiple discharge points and into the Russian River.

140.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

141.     CSPA is informed and believes, and thereon alleges, the Russian River, the Receiving Waters herein, is a water of the United States, and/or a tributary to a traditionally navigable water.

142.     CSPA is informed and believes, and thereon alleges, that polluted stormwater and non-stormwater discharges from the Facilities to the Receiving Waters.

143.     Stormwater discharges containing pollutants, including but not limited to, heavy metals such as zinc, aluminum, and iron adversely affect the aquatic environment.

144.     Samples of stormwater discharges collected at the Facilities contain pollutants including zinc, iron, aluminum, copper, TSS, COD, O&G, and pH affecting substances, in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, EPA Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

145.     CSPA is informed and believes, and based upon Annual Reports obtained from the Regional Board following service of the Notice Letter herein, that the Facilities reported multiple effluent exceedances from the 2011-2012, 2012-2013 and 2013-2014 reporting years, including but not limited to, exceedances of O&G, COD, TSS, Al, Fe, Cu, Pb, and Zn. Total petroleum hydrocarbons ("TPH") have also been present at the Facilities and reported in high concentrations.

146.     CSPA is informed and believes, and thereon alleges, that during and/or after every significant rain event[4] or any other stormwater or non-stormwater discharge that has occurred at the Facilities since October 6, 2011 through the present, Defendants have discharged and continue to

---

[4] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

discharge stormwater and non-stormwater from the Facilities that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the EPA Benchmarks, CTR, and the WQS.

### G. Defendants' Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements

147.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to develop an adequate M&RP for industrial operations at the Facilities that complies with Section B of the 1997 Permit, and Section XI of the 2105 Permit.

148.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to revise the M&RP for the Facilities as necessary to ensure compliance with the 1997 Permit, in violation of Section B(2)(d), and Section XI of the 2105 Permit.

149.    CSPA is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to collect samples during the first hour of the first storm event of the Wet Season over the past five years, in violation of Section B(5)(a) of the 1997 Permit and Section XI(B) of the 2015 Permit.

150.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to analyze stormwater samples collected at the Facilities for all toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharges, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

151.    CSPA is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to demonstrate that stormwater sampling limited to those listed in the Facilities' 2015 SWPPPs, are representative of pollutants from the Facilities, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

152.    CSPA is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to sample stormwater discharges from all discharge locations, in violation of Section B(7) of the 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

153.    CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise the M&RP for the Facilities as necessary to ensure compliance with the

1  Storm Water Permit in violation of Sections A(9) and A(10) of 1997 Permit and Sections XI(B) and

2  XI(C) of the 2015 Permit.

3        154.   CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators of

4  the Facilities consistently fail to perform visual observations of stormwater during QSEs.

5        155.   CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators of

6  the Facilities have consistently failed and continue to fail to report any noncompliance with the Storm

7  Water Permit at the time that the Annual Report is submitted, including: 1) a description of the

8  noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been

9  corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and

10  prevent recurrence of the noncompliance as required by the 1997 Permit, Section C(11)(d).

11        156.   CSPA is informed and believes, and thereon alleges, that Defendants' certifications of

12  compliance with the 1997 Permit in each of its past five (5) Annual Reports, provided the Annual

13  Reports were in fact submitted, were erroneous because Defendants have not developed and/or

14  implemented the required BMPs, or revised the SWPPP or the M&RP, as required by Sections A and B

15  of the 1997 Permit.

16        157.   CSPA is informed and believes, and thereon alleges, that Defendants have failed to

17  submit complete Annual Reports to the Regional Board in violation of Section B(14) of the 1997 Permit.

18  **VI.**     **CLAIMS FOR RELIEF**

19  **FIRST CAUSE OF ACTION**
          **Discharges of Contaminated Stormwater in Violation of**

20  **the Storm Water Permit's Effluent Limitations and the Clean Water Act.**
          **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

21

22        158.   CSPA incorporates the allegations contained in the above paragraphs as though fully set

23  forth herein.

24        159.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continues

25  to fail to reduce or prevent pollutants associated with industrial activities at the Facilities from

26  discharging from the Facilities through implementation of BMPs that achieve BAT/BCT.

27        160.   CSPA is informed and believes, and thereon alleges, that discharges of stormwater

28  containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the

Facilities occur every time stormwater discharges from the Facilities. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facilities is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

161.    The Owners and/or Operators and Defendants violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facilities.

162.    CSPA is informed and believes, and thereon alleges, that Defendant's violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

163.    Each day since at least October 6, 2011 that Owners and/or Operators discharge stormwater containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

164.    By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 6, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

165.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

166.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION
### Defendants' Discharges of Contaminated Stormwater in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

167.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

168.    CSPA is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that adversely impact human health and/or the environment from Facilities occur each time stormwater discharges from the Facilities.

169.    CSPA is informed and believes, and thereon alleges, that stormwater containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facilities each time stormwater discharges from the Facilities.

170.    The Owners and/or Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time stormwater containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facilities.

171.    CSPA is informed and believes, and thereon alleges, that the Owners' and/or Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

172.    Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

173.    By committing the acts and omissions alleged above, the Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 6, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

174.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

175.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendants' Discharges of Non-Stormwater in Violation
of the Storm Water and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

176.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

177.    CSPA is informed and believes, and thereon alleges, that prohibited non-stormwater discharges have discharged and continue to discharge from the Facilities, in violation of the Storm Water Permit and/or CWA Section 301(a), 33 U.S.C. § 1311(a).

178.    CSPA is informed and believes, and thereon alleges, that the Owners' and/or Operators' violations of Discharge Prohibitions of the Storm Water Permit are ongoing and continuous.

179.    Each and every violation of the Storm Water Permit's Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

180.    By committing the acts and omissions alleged above, the Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 6, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

181.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

182.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendants' Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

183.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

184.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to develop adequate SWPPPs for the Facilities, in violation of the Storm Water Permit.

185.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately implement SWPPPs for the Facilities, in violation of the Storm Water Permit.

186.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately revise the SWPPPs for the Facilities, in violation of the Storm Water Permit.

187.    The Owners and/or Operators have been in violation of the Storm Water Permit at the Facilities every day from October 6, 2011 to the present.

188.    The Owners' and/or Operators' violations of the Storm Water Permit and the CWA at the Facilities are ongoing and continuous.

189.    The Owners and/or Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPPs for the Facilities.

190.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Facilities is a separate and distinct violation of the CWA.

191.    By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 6, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

192.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

193.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### FIFTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

194.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

195.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to develop an adequate M&RP for the Facilities, in violation of the Storm Water Permit.

196.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately implement an M&RP for the Facilities, in violation of the Storm Water Permit.

197.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to adequately revise an M&RP for the Facilities, in violation of the Storm Water Permit.

198.    The Owners and/or Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facilities every day from October 6, 2011 to the present.

199.    The Owners' and/or Operators' violations of their Storm Water Permit's monitoring requirements and the CWA at the Facilities are ongoing and continuous.

200.    The Owners and/or Operators will continue to be in violation of Section B and Provision E(3) the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an M&RP for the Facilities.

201.    Each and every violation of the Storm Water Permit's M&RP requirements at the Facilities is a separate and distinct violation of the CWA.

202.    By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 6, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

203.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

204.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### SIXTH CAUSE OF ACTION
**Defendants' Failure to Report as Required by the Storm Water
Permit in Violation of the Storm Water Permit and the
Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

205.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

206.    Receiving Water Limitation C(3) of the 1997 Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to current BMPs in order to prevent or reduce any pollutant in stormwater discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, those BMPs must be implemented into the Facilities' SWPPPs.

207.    Receiving Water Limitation C(4)(a) of the 1997 Permit requires the report to be submitted to the Regional Board no later than 60-days from the date the discharger first learns its discharge is causing or contributing to an exceedance of an applicable water quality standard. Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.

208.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the 1997 Permit.

209.    CSPA is informed and believes, and thereon alleges, that the Owners' and/or Operators' Annual Reports for the Facilities failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit.

210.    CSPA is informed and believes, and thereon alleges, that the Owners and/or Operators have failed and continue to fail to submit complete Annual Reports for the Facilities to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the 1997 Permit.

211.    The Owners and/or Operators have been in violation of Sections B(14), C(9), C(10), and/or C(11) of the 1997 Permit and CWA every day since at least October 6, 2011.

212.    The Owners and/or Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facilities without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit.

213.    The Owners and/or Operators have been in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit every day since at least October 6, 2011.

214.    The Owners' and/or Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

215.    By committing the acts and omissions alleged above, the Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 6, 2011 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

216.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

217.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## VII.    RELIEF REQUESTED

218.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring Defendants to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Facilities in violation of a permit issued pursuant to

Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent benchmarks, standards, or limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.      A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.      A Court order assessing civil monetary penalties for each violation of the CWA at $37,500 per day per violation for violations occurring since October 6, 2011, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.      A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.      Any other relief as this Court may deem appropriate.

Dated: December 13, 2016                    Respectfully submitted,

Anthony M. Barnes
AQUA TERRA AERIS LAW GROUP
Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION
ALLIANCE